## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ROBERT E. ADAMS,                                    )
                                                    )
                        Plaintiff,                  )
                                                    )
        v.                                          )
                                                    )       Case No.
FRANK ORTIZ III, in his individual and              )
official capacities while serving as a Special      )
Agent with the New Mexico Attorney                  )
General's Office.                                   )
                                                    )
                                                    )
                        Defendant.                  )
                                                    )

## COMPLAINT FOR CIVIL RIGHTS VIOLATIONS

Pursuant to the United States Supreme Court's decision in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) and 42 U.S.C. § 1983, Plaintiff Robert E. Adams, by and through counsel, Freedman Boyd Hollander Goldberg Urias & Ward P.A. (Vincent J. Ward and Frank T. Davis Jr.), hereby brings this Complaint for Civil Rights violations against Defendant Frank Ortiz III. As grounds for this Complaint, Plaintiff states as follows:

### JURISDICTION AND VENUE

1.      Jurisdiction and venue are proper pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), 42 U.S.C. § 1983, 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367.

2.      Mr. Adams is a resident of Bernalillo County, New Mexico.

3.      Upon information and belief, Frank Ortiz III is a resident of the State of New Mexico.

4.      Upon information and belief, all of the acts complained of in this Complaint occurred within Bernalillo County, New Mexico and Jefferson County, Colorado.

5.      At all times material to this Complaint, Defendant was acting under the color of law and in the scope of his employment as a special agent for the New Mexico Attorney General' Office (NMAGO).

## PARTIES

6.      Mr. Adams resides in Albuquerque, New Mexico, where he owns and operates a small business that buys and sells rare, old, historically significant firearms.

7.      At the time of the events described herein, Defendant was employed as a special agent with the NMAGO.

## FACTUAL BACKGROUND

8.      This civil rights claim arises from the illegal search and seizure of Mr. Adams' personal and business properties in New Mexico and Colorado in late January and early February of 2013. Defendant Frank Ortiz III, then a special agent with the NMAGO, sought and obtained eight federal warrants in New Mexico and Colorado as part of an investigation into Mr. Adams' alleged participation in a gun smuggling scheme ostensibly to avoid import and excise tax laws.

9.       After extensive litigation, including sworn testimony by Defendant Ortiz at a suppression hearing, Judge James A. Parker found the warrant affidavit failed to establish probable cause. *See United Sates v. Adams*, 2014 WL 10897235 (D.N.M. July 8, 2014. The United States Court of Appeals for the Tenth Circuit affirmed Judge Parker's suppression order on July 7, 2015. *See United States v. Adams*, 615 Fed. Appx. 502 (10th Cir. 2015) (unpublished).

10.     During the course of the illegal searches law enforcement officials seized approximately sixteen hundred firearms. They also illegally seized hundreds of pages of personal and business records, computer hard-drives and other electronic information.

11.     As a result of the illegal searches and seizures, Mr. Adams suffered irreparable damage to his one-of-a-kind collection of rare, old, historically significant firearms; he was put out of business until his inventory was returned months later; his business reputation suffered, which resulted in lost income; and he incurred hundreds of thousands of dollars in legal expenses to fight the charges brought against him by the United States Attorney's Office (USAO) in the District New Mexico. The federal charges were based exclusively on evidence unlawfully seized from Mr. Adams' home and business in Albuquerque, New Mexico.

*Background regarding Mr. Adams' Collection of Firearms*

12.     Mr. Adams is an avid collector of rare, old, historically significant firearms. He began collecting firearms as teenager and eventually left his job with the federal government to pursue his passion full-time. Over the years Mr. Adams amassed a valuable collection of firearms, most of which are over fifty years old and only of value to collectors like Mr. Adams. They generally serve no sporting or defensive purpose whatsoever. Mr. Adams studies and writes about his old firearms, many of which can be traced to significant historical events around the world.

13.     Given the rare nature of the firearms he collects, Mr. Adams sometimes acquires firearms from dealers outside the United States. To import these firearms into the United States, Mr. Adams holds an importer's license. He is also licensed to possess firearms in Canada.

14.     Mr. Adams has held various federal firearms licenses since approximately 1960.

*Background regarding Defendant Ortiz's Investigation and Warrant Affidavit*

15.     At the time of the illegal searches and seizures, Defendant Ortiz served as a special agent with the NMAGO. According to his warrant affidavit, the NMAGO assigned Defendant to work as a Task Force Officer with the Department of Homeland Security (DHS). In this capacity Defendant worked with DHS's Homeland Security Investigations Federal Financial Crimes Unit in Albuquerque.

16.     In his warrant affidavit Defendant touts his extensive experience in investigations involving firearms. For example, before joining the NMAGO Defendant worked for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for twenty-seven years, retiring in December 2011. He claims that during his federal and state law enforcement career he had investigated numerous violations of federal criminal statutes, including violations of federal firearms laws. He also claims to have inspected numerous federal firearms licensees throughout his law enforcement career. In sworn testimony at the suppression hearing, Defendant Ortiz later admitted he knew nothing about the firearms importation process.

17.     Defendant's investigation of Mr. Adams began in 2011 while he was still employed by ATF. The investigation stemmed from erroneous complaints by ATF and United States Customs and Border Protection Services (CBP) officials about Mr. Adams' import forms and recordkeeping practices. Mr. Adams often challenged ATF and CBP's arbitrary enforcement decisions, which riled a few federal officials.

18.     On January 18, 2013, January 23, 2013 and March 22, 2013, Defendant Ortiz sought five warrants to search Mr. Adams' personal residence as well as his business office, trailer, storage closet and unopened mail.  The warrant applications were filed in five separate actions in the United States District Court for the District of New Mexico, all of which relied on

the same warrant affidavit written and sworn to under oath by Defendant (the affidavit is attached as Exhibit A). The search warrant matters opened in New Mexico are: (1) In the Matter of the Search of LOAD RUNNER TRAILER bearing NM License Plate 33068 TRD (Case No. 1:13-mr-0038-LFG); (2) In the Matter of the Search of SW LLC aka ADAMS INTERNATIONAL, 3200 Carlisle NE, Albuquerque, NM 87110 (Case No. 1:13-mr-0039-LFG); In the Matter of the Search of ROBERT E. ADAMS' residence (Case No. 1:13-mr-0040-LFG); (4) In the Matter of the Search of SW LLC ADAMS INTERNATIONAL, 3200 Carlisle NE, Albuquerque, NM 87110 (Case No. 1:13-mr-0044-LFG); and (5) In the Matter of the Search of Unopened U.S. and International mail addressed to Robert E. ADAMS and associated businesses (Case No. 1:13-mr-00209-KBM).  *See* Ex's. B through F (the affidavits have been removed due to size limitations associated with the electronic filing of the Complaint).

19.     On February 5, 2015, Defendant sought three separate warrants in the United States District Court for the District of Colorado. Defendant sought to search a warehouse located in Golden and a business office and residence located in Lakewood. The warrant affidavit used for these warrant applications is substantially the same as the affidavit used in New Mexico, except that it includes a few additional allegations related to licensure issues. The matters opened in Colorado are: (1) In the Matter of the Search of SW LTD, 2103 S. Wadsworth Blvd., Suite 217, Lakewood, Colorado, 80227 (Case No. 13-sw-05128-MJW; (2) In the Matter of the Search of Robert E. ADAMS residence. 1538 South Yank Street, Lakewood, Colorado 80228 (Case No. 1:13-sw-05129-MJW; and (3) In the Matter of the Search of Robert E. ADAMS Warehouse, 869 Brickyard Circle, Unit # D-6, Golden, Colorado, 80403 (Case No. 13-sw-05130-MJW). *See*  Ex.'s G-I.

20.     Defendant's warrant affidavit submitted in support of the eight separate warrant applications include allegations about ATF's administrative oversight of Mr. Adams and his firearms businesses in the 2000s, criticisms of Mr. Adams' recordkeeping and importation practices, inquiries of Mr. Adams' travel history, tax filings, and most significantly, Mr. Adams' storage of firearms in Canada in 2012.

21.     *The warrant affidavit's allegations regarding ATF's compliance inspections in 2006 and 2009*: To begin with, Defendant's warrant affidavit contains various allegations about ATF's interaction with Mr. Adams during the course of compliance inspections in 2006 and 2009. In particular, Defendant's warrant affidavit alleges ATF cited Mr. Adams in 2006 for minor recordkeeping violations and for removing importer's marks from thirty-five firearms (out of hundreds inspected). Ex. A, Affidavit ¶ 6. ATF also took issue with Mr. Adams' legal transfer of firearms from his business inventory to his personal collection. *Id.* ¶ 4. The warrant affidavit does not contain any specific allegation of wrongdoing associated with the 2009 compliance inspection. *Id.* ¶¶ 1-3. The warrant affidavit accuses Mr. Adams of being uncooperative during the 2006 and 2009 inspections.

22.     The district court and the Tenth Circuit considered the allegations about the 2006 and 2009 compliance inspections, but correctly found they did not support a finding of probable cause to seize Mr. Adams' property.

23.     As the Tenth Circuit explained, the allegation regarding the 2006 and 2009 compliance inspections "predates the signing of the warrants by over three years." *Adams*, 615 Fed. Appx. at 507. Law enforcement officers "would not reasonably expect [any evidence of wrongdoing associated with the inspections] to remain stationary for years at a time." *Id.*

Because the allegations about the 2006 and 2009 compliance inspections "[were] stale, it would not contribute to a finding of probable cause." *Id.*

24.     *The warrant affidavit's allegations regarding Mr. Adams' out of business records:* Defendant's warrant affidavit alleges an ATF Industry Operations Investigator named Theresa Duran (IOI Duran) found discrepancies between Mr. Adams' 2006 and 2009 acquisition and disposition records after a review in 2010. Mr. Adams turned in the 2009 records after closing his sole proprietorship, Adams International. ATF had access to Mr. Adams' 2006 records because of a prior administrative inspection. IOI Duran alleged the discrepancies between the 2006 and 2009 records violated 18 U.S.C. § 922(m), a recordkeeping statute. Ex. A, Affidavit ¶ 5. *Id.* IOI Duran also criticized Mr. Adams for transferring firearms from his business inventory to his personal collection, which she incorrectly theorized Mr. Adams had done to avoid paying excise taxes. *Id.* ¶ 13.

25.     IOI Duran's opinion is wrong, however, because the law permits Mr. Adams to conduct these transfers. Moreover, none of the allegations contained in Defendant's warrant affidavit about Duran's review work, which she performed in 2010, involve allegations of firearms smuggling. Rather, IOI Duran's review work at best revealed a few minor recordkeeping errors. This would not provide probable cause to seize Mr. Adams' entire collection of firearms or all of his personal and business records related to his firearms activities.

26.     The district court and the Tenth Circuit considered the warrant affidavit's allegations about the alleged discrepancies in Mr. Adams' out-of-business records, but correctly found they did not support a finding of probable cause. *See Adams*, Fed. Appx. at 507.

27.     *Mr. Adams' firearms businesses*: Although he never explains why, Defendant lists some of Mr. Adams' businesses. *See* Ex. A, Affidavit ¶ 13. These allegations are largely

incomprehensible and merely point out that Mr. Adams closed one of his firearms businesses in 2009.

28.     The only specific allegation associated with Mr. Adams firearms businesses is that on *one* occasion he apparently listed an unlicensed business name on a CBP Form 3461 (a form used for entries). *Id.*  The affidavit alleges the import might have violated 18 U.S.C. § 923(a) because the import included unidentified "sports weapons." *Id.*

29.     The district court considered this allegation, finding it was "in no way clear from the affidavit that Defendant smuggled these "sports weapons" rather than importing them openly and legally." *Adams*, 2014 WL 10897235, *13. Even if true, the allegation was stale and could not support a finding of probable cause. *See Adams*, Fed. Appx. at 507.

30.     *Mr. Adams' advertisement of firearms without importer's marks*: Defendant's warrant affidavit includes three allegations about importer's marks. First, during the 2006 compliance inspection ATF cited Mr. Adams for removing importer's marks from thirty-two firearms (out of hundreds inspected). *Id.* ¶ 6. Second, the investigation apparently revealed Adams advertised an insignificant number of guns as not having importer's marks. *Id*. Third, the warrant affidavit alleges it is a felony offense to remove importer's marks from firearms.

31.     The district court and the Tenth Circuit found these allegations did not support a finding of probable cause because they were stale, *see Adams*, Fed. Appx. at 507, and because "selling firearms without importer's marks is perfectly legal." *Adams*, 2014 WL 10897235, *15. Moreover, it is not a felony offense to remove importer's marks from firearms. The district court found this to be a false statement and excised it from the warrant affidavit pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

32.     *The tax evasion allegations*: Defendant's warrant affidavit also alleges Mr. Adams did not file personal tax returns in 2006, and 2008 through 2011, and did not file state tax returns in 2010 or 2011. *See* Ex. A, Affidavit ¶¶ 34-37. The Tenth Circuit considered the tax allegations and concluded that they did not support a finding of probable cause because "the search warrants were based on a specific type of law-breaking: gun smuggling." *Adams*, 615 Fed. Appx. at 506. Hence, "the tax evidence provide[d] no reason to tie Mr. Adams' income to a gun smuggling operation." *Id.* Therefore, the tax allegations would not support a finding of probable cause.

33.     *The allegations regarding Mr. Adams' submission of multiple import forms*: Defendant's warrant affidavit alleges Mr. Adams submitted eighteen applications to import firearms between 2008 and 2011 (i.e., ATF Form 6s). *See* Ex. A, Affidavit ¶ 13. An ATF Form 6 is an application to import firearms into the United States. It is submitted to CBP before any firearms are ever imported into the United States. According to the warrant affidavit, ATF approved only one of the eighteen applications without conditions (meaning Mr. Adams had permission to import all of the firearms listed on the form). *Id.* The affiant failed to include any information about whether CBP approved seven of the applications, so no reasonable inferences can be deduced from the allegations. *Id.* Five applications were partially or conditionally approved, one was disapproved and two were voided, so no reasonable inferences of gun smuggling could be drawn from these applications either. *Id.*

34.     The district court carefully considered these allegations and determined they did not support a finding of probable cause. First, affiant misunderstood and transcribed the wrong dates on the warrant affidavit. *United States v. Adams*, Cr. No. 13-3301 JAP, (Doc. 39 at 12) (D.N.M. Apr. 18, 2014). Second, the court found Defendant did not understand the importation

process and therefore lacked the requisite experience or expertise to offer an opinion about the significance of Mr. Adams' submission of the applications, a finding the government agreed with (*Id.* at 15). And third, the warrant affidavit is ambiguous as to whether Mr. Adams ever imported firearms associated with the approved, conditionally approved and partially approved applications. *See* Ex. A, Affidavit ¶ 13.

35.     The warrant affidavit also includes information from a letter written by ATF technician Michael Cooney in 2006, seven years before the issuance of the warrants. *Id.* ¶ 41. The warrant affidavit claims Cooney had four concerns about Adams' use of Form 6. *Id.* Adams submitted multiple applications to import sporting weapons, alleged to be not importable under 18 U.S.C. § 925(d)(3). *Id.* He allegedly manipulated firearm parts to make them importable and inserted "fictitious" firearms on the forms. *Id.* And finally, Adams submitted twenty-eight import applications in a six-month period, but claimed by letter he had not imported any firearms in two years. *Id.*

36.     Importantly, the Cooney letter does not allege Adams' import practices violated any law or perpetuated a gun smuggling scheme, nor does it say whether ATF approved any import applications Mr. Adams allegedly submitted. Finally, the Cooney allegations make no claim that Adams attempted to smuggle any firearms.  Therefore, the Cooney letter adds nothing to the probable cause analysis.

37.     *Mr. Adams' storage of firearms in Canada*: Defendant's warrant affidavit contains *one* allegation pertaining to gun smuggling—that Mr. Adams hid fifty-one firearms in a storage locker in Canada with the *intent* of smuggling them.  *See id.* ¶¶ 14, 16-17, 19-21, 33, 39-40. The crux of the allegation is that Mr. Adams requested permission to import virtually all of the firearms stored in Canada, but when he actually presented the form to verify the import (an

ATF Form 6A) to CBP officials, that form did not include 51 of the firearms that CBP had given

him authority to import. The district court made the following factual findings with respect to

this allegation.

> [I]n 2011, Bud Haynes & Company shipped Defendant's 133 firearms, for which
> Defendant executed and filed an ATF Form 6.  Affidavit ¶¶ 14, 16, 21, 33, 40.
> Although CBP forwarded SA Ortiz a copy of a Form 6A "by Robert E. ADAMS," the
> shipment never arrived at the Sweetgrass, Montana Port of Entry. Affidavit ¶¶ 14, 17,
> 19-21, 33, 39. On August 15, 2011, CBP Trade Operations Chief Bob Brusven told
> SA Ortiz that "the firearms importation shipment may not have been allowed," based
> on suspicion of prior misconduct. Affidavit ¶¶ 14. On July 27, 2012, Canadian law
> enforcement officials searched a Calgary, Alberta, storage locker rented by Defendant
> and seized 132 of the 133 firearms that were purchased from Bud Haynes &
> Company, which were being stored in the locker in violation of Canadian law.
> Affidavit ¶ 33. According to Canadian officials, Defendant had stored the firearms in
> a locker since September 2011.  Affidavit ¶ 21. The missing firearm was a GEVARM
> .22 LR caliber rifle. Affidavit ¶ 40. A review of the Weapons Seizure list against the
> Form 6A showed that all the firearms listed on the 6A were recovered, as were 51
> firearms not listed on the 6A. Affidavit ¶ 39.  In other words, only 81 of the 133
> firearms purchased from Bud Haynes & Company were listed on the Form 6A.

*Adams*, 2014 WL 10897235, *12.

38.     From these allegations SA Ortiz opined, "ADAMS therefore falsified ATF F 6A,

as he never intended to import the dozens of firearms he secreted into his Canadian Storage

locker." Ex. A, Affidavit ¶ 39.

39.     The district court initially accepted the allegation as true because it "was acting

under the misapprehension that Defendant had only obtained approval to import part of the Bud

Haynes & Company shipment. The [court] believed Defendant had failed to obtain approval,

using an ATF Form 6, to import 51 of the firearms in the shipment." *Adams*, 2014 WL

10897235, *6. "As it turns out, however, most of these 51 firearms were listed on an approved

Form 6." *Id*. Indeed, the defense presented evidence showing the government had approved all

but eleven firearms for import. *Id*. Of the eleven, ten are antiques and do not require government

approval to import. *Id*. Adams mistakenly left one firearm off the Form 6, but this is insignificant

11

because the government conceded during pretrial litigation that Mr. Adams' omission was not relevant to the probable cause analysis *United States v. Adams*, Cr. No. 13-3301 JAP, (Doc. 31 at *23) (D.N.M. February 23, 2014).

40.     The Tenth Circuit also carefully considered the allegations pertaining to Mr. Adams' storage of firearms in Canada, finding they did not establish probable cause for the searches and seizures, explaining:

> The [Defendant's] theory of "falsification" is not only invalid under the regulations but also illogical. For roughly ten months, Mr. Adams stored the guns, listing some and omitting some. For the guns omitted on the Form 6A, the [Defendant] infers from the omission that Mr. Adams never intended to lawfully import the guns. For the guns included on the Form 6A, the affiant infers from the inclusion that Mr. Adams was falsifying the form because he never intended to lawfully import the guns. The government's theory illustrates the adage: "Heads I win, tails I win."

*Adams*, 615 Fed. Appx. at 505. The Tenth Circuit hammered the point home as follows,

> But let's assume that Mr. Adams was planning to smuggle all of the 132 guns from Canada in 2011. The search warrants were not to search the storage unit; they were to search Mr. Adams' properties in Albuquerque, New Mexico. The court could issue the search warrants only if there was a fair probability that Mr. Adams had guns, records, or other evidence of smuggling in those properties. Even if Mr. Adams had intended to smuggle the guns from Canada, nothing in the affidavit would have suggested the presence of smuggled guns, records, or other gun-smuggling evidence in Mr. Adams' New Mexico properties in 2013 (when the warrants were signed).

*Id.* (citation omitted).  For these reasons the district court and the Tenth Circuit determined the allegations related to Mr. Adams' storage of firearms in Canada did not support a finding of probable cause.

41.     *The allegations concerning Mr. Adams' travel to Canada:* Finally, Defendant's warrant affidavit cites information pulled from an unidentified government database about Adams' travel to Canada. *See* Ex. A, Affidavit ¶¶ 22-32. The queries showed that between 1994 and 2001 Adams flew to Canada seven times without a return flight. *Id.* ¶¶ 22-29. Mr. Adams

drove to Canada one time in 2009. *Id.* ¶ 24. And in April 2011 he twice flew to Canada, once

with a return flight and once without. *Id.* ¶¶ 31-32. All told, the unidentified database allegedly

showed Mr. Adams traveled to Canada three times between 2009 and 2011. The affidavit does

not draw any specific conclusions from these travel records.

42.     The warrant affidavit also implies that sometime in 2011 Mr. Adams traveled to

Canada to smuggle one Gevarm .22 rifle, which may have been among the firearms placed in the

storage locker. *Id.* ¶ 40 . As the Tenth Circuit found, however, the affidavit presents

contradictory information about whether this particular rifle was actually in storage. "In one

paragraph, the affiant lists the Gevarm as one of the guns seized from the Canadian storage unit.

But in the next paragraph, the affiant states the Gevarm was missing from the guns seized. … In

light of the contradiction, the court would have no way of knowing whether the gun had been

seized." *Adams*, 615 F. Appx. at 506 (10th Cir. 2015). Both the district court and Tenth Circuit

found that under "these circumstances, the 2011 trips to Canada would not contribute to a finding

of probable cause." *Id.*

43.     Even if all of the allegations contained the warrant affidavit are considered as a

whole, they, as the district court and Tenth Circuit explained, do not support a finding of

probable cause for the illegal searches or seizures.

### *Background regarding the facts and circumstances of the searches*

44.     On January 23, 2013, Mr. Adams was returning to his residence in Albuquerque

from a medical appointment. Approximately two blocks from his home, law enforcement

officials suddenly blocked his vehicle.

45.     Law enforcement agents jumped from the vehicles bearing automatic weapons,

which were pointed at Mr. Adams. They demanded that he exit his vehicle and raise his hands.

Mr. Adams was searched, handcuffed, and placed into the back seat of his own vehicle. Defendant drove Mr. Adams to his residence.

46.    Thereafter, law enforcement agents ordered Mr. Adams' wife to exit the Adams' home, whereupon she was also detained and placed into the front passenger seat of Mr. Adams' vehicle.

47.    Mr. and Mrs. Adams were told they were being detained, and were not permitted to exit the vehicle for approximately an hour.

48.    While in custody, Mr. Adams was told that agents were executing a warrant related to alleged gun smuggling.

49.    Mr. Adams was Mirandized, after which he asserted his right to counsel.

50.    Throughout the day, numerous law enforcement officials arrived on scene, primarily agents of DHS, but the raid also included other governmental agencies. Some government officials were dressed in military style or SWAT gear and were also armed with automatic weapons.

51.    Mr. Adams' place of business was raided on the same day, as well as a trailer owned by Mr. Adams, which was parked at a neighbor's home across the street from Mr. Adams's residence. Later law enforcement searched a storage closet and unopened mail.

52.    As the searches continued, Mr. Adams was permitted to exit his vehicle, contacted an attorney, and stood outside the perimeter of his property, where a crowd, including news media gathered. A helicopter circled overhead for much of the day. The search began around 8:30 a.m. and did not conclude until approximately 9:00 p.m.

53.     Mr. Adams estimates as many as one-hundred law enforcement officials came and went from his home, loading numerous items, including but not limited to his prized collection of old firearms.

54.     During the course of the raids, and the news media spectacle, Mr. Adams suffered substantial property damage, including property that was roughly handled, broken, and destroyed. Federal agents pried containers open, separated firearms from their holsters, and broke firearms apart, which has caused irreparable damage to his collection of firearms.

55.     Subsequently, on February 5, 2013, Defendant Ortiz was again the affiant for additional warrant applications for properties owned by Mr. Adams in Colorado

56.     On February 7, 2013, Defendants raided properties owned or rented by Mr. Adams in Colorado, seizing private documents and over one hundred firearms.

57.      Mr. Adams was not made aware of the illegal searches in Colorado until a neighbor telephoned him to inform him that his property was being searched.

58.     Defendants gained access to Mr. Adams' properties by breaking into the house and warehouse and prying open safes. They seized firearms and firearms-related records and documents, and materials pertaining to Mr. Adams's business and firearms collection.

59.     During the illegal searches and seizures conducted by Defendants on January 23, 2013 in Albuquerque, New Mexico and on February 7, 2013 in Lakewood and Golden, Colorado, Defendants seized hundreds of thousands of dollars worth of Mr. Adams's property, including but not limited to nearly sixteen hundred rare and historically significant firearms, computer equipment, paperwork and other personal property.

60.     Shortly after the illegal searches and seizures, Mr. Adams filed a pre-indictment motion for the return of his property pursuant to Rule 41 of the Federal Rules of Criminal Procedure.

61.     After the filing the government returned several of Mr. Adams' firearms. the government agreed to return the vast majority of Mr. Adams's property – including almost all of the rare and collectible firearms seized from his personal residences and businesses in New Mexico and Colorado.

62.     The first such return of firearms took place on May 3, 2013, when DHS returned two guns from among the nearly 1600 items seized, and a backup copy of certain computer files agents had seized.  A second return of firearms, which had been seized in Colorado, took place on September 10, 2013.

63.     Some of the firearms seized during the New Mexico raids were returned to Mr. Adams on September 23 and 24, 2013.

64.     Another return of seized firearms and Mr. Adams's property occurred on November 26, 2013.

65.     Mr. Adams was eventually indicted in Case No. 1:13-cr-03301-JAP and prosecuted under forty-seven (47) counts of various alleged firearms and importation of firearms charges. The charges were exclusively related to evidence seized from Mr. Adams' properties.

66.     The charges against Mr. Adams were dismissed on July 16, 2015 about a week after the Tenth Circuit affirmed the district court's suppression order.

67.     After the unsubstantiated charges against Mr. Adams were dismissed, most of the remainder of Mr. Adams's seized property and firearms were returned to him.

16

68.     Mr. Adams's property was substantially and severely damaged during and/or after the illegal searches and seizures.

69.     At least one valuable firearm remains missing.

70.     An antique 1839 U.S. Flintock Musket was broken in half.

71.     A rare and collectible Gustloff Shotgun suffered irreparable damage.

72.     Various parts of Mr. Adams's firearms were missing or broken including, but not limited to: pistol grips, holsters, firearms magazines, crates, pistol boxes, and presentation cases.

73.     Virtually all of the seized firearms were mishandled and/or carelessly stored.

74.     All of the firearms had scratches and gouges that were not present before the illegal searches and seizures.

75.     At least three (3) of Mr. Adams's computer hard drives were destroyed.

76.     The destruction of the hard drives caused Mr. Adams to lose thousands of dollars worth of data.

77.     As a result of the illegal searches and seizures, Mr. Adams lost income and suffered business related damages including, but not limited to: lost purchasing and sales opportunities. Mr. Adams's business reputation has also been irreparably damaged.

78.     Mr. Adams's home was ransacked. Doors, windows, furniture, flooring, storage containers, and other items were destroyed and/or severely damaged.

79.     Mr. Adams dedicated his life to his business and firearms collection and thus suffered significant emotional distress as a result of the illegal searches and seizures.

80.     Mr. Adams expended substantial sums of money, time, and resources and incurred attorneys' fees to defend against the charges that resulted from the illegal searches and

seizures – which were dismissed after the district court suppressed all evidence and the Tenth Circuit affirmed the suppression.

81.    Perhaps just as egregious as the illegal searches and seizures, the ostensible basis therefore, the affidavit executed by SA Frank Ortiz III, was farcical.

82.    As Judge Parker recognized, the search warrants obtained for Mr. Adams' residential and business properties were based, in part, on false statements and misrepresentations that were recklessly included in Defendant's warrant affidavit.  Had he understood the firearms importation process, educated himself on the various import forms used by Mr. Adams, and conducted a careful investigation, Defendant would have understood that there were not legally sufficient grounds to seize Mr. Adams' collection of firearms and business and personal records related to his firearms activities.

83.    Judge Parker chided Defendant Ortiz for his "insouciant attitude" and "disregard for his duty to accurately present the facts to the magistrate judge." *United States v. Adams*, Cr. No. 13-3301 JAP, (Doc. 39 at *13) (D.N.M. Apr. 18, 2014).

84.    In procuring search warrants for the illegal and unreasonable searches and seizures, SA Ortiz and ATF officials included "numerous misstatements about [federal firearms license] requirements," relied on rumors and unexplained occurrences, and "repeatedly overlooked details that affect[ed] the accuracy of their statements." *Id*. at *10.

85.    Instead of respecting Mr. Adams's well-established rights to remain free from illegal and unreasonable searches and seizures and lawfully own and possess firearms, Defendants obtained search warrants for Mr. Adams's property by piling hunch upon hunch upon hunch.

86.     No reasonable person could derive an ongoing gun smuggling scheme from old compliance inspections, contradictory information related to import permits, and a few trips to Canada. The Defendants' conduct is inexcusable.

87.     Mr. Adams is entitled to an award of damages to compensate him for the harm he suffered as a result of Defendants' violations of his constitutionally protected rights under the Fourth Amendment of the United States Constitution.

## COUNT I: FOURTH AMENDMENT – ILLEGAL SEARCHES

88.     Mr. Adams incorporates by reference the preceding paragraphs as though set forth fully herein.

89.     Mr. Adams has a Fourth Amendment right to remain free from unlawful, unreasonable, and/or illegal searches.

90.     Defendant Ortiz and other law enforcement officials searched Mr. Adams' residential, business and other personal properties on January 18, 2013, January 23, 2013 and March 22, 2013 in Albuquerque (Bernalillo County), New Mexico and on February 7, 2013 in Lakewood and Golden (Jefferson County), Colorado pursuant to search warrants procured by Defendant.

91.     The officers, agents, and others who participated in and conducted the illegal searches, including Defendant, were government officials, acting under color of law.

92.     The searches to which Mr. Adams was subjected were illegal or otherwise unjustified under the law and done without any probable cause or reasonable basis.

93.     Mr. Adams has suffered actual, tangible injuries as a result of the illegal searches for which he is entitled to recover damages at trial.

## COUNT II: FOURTH AMENDMENT – ILLEGAL SEIZURES

94.     Mr. Adams incorporates by reference the preceding paragraphs as though set forth fully herein.

95.     Mr. Adams has a Fourth Amendment right to remain free from unlawful, unreasonable, and/or illegal seizures.

96.     Defendant Ortiz and other law enforcement officials searched Mr. Adams' residential, business and other personal properties on January 18, 2013, January 23, 2013 and March 22, 2013 in Albuquerque (Bernalillo County), New Mexico and on February 7, 2013 in Lakewood and Golden (Jefferson County), Colorado pursuant to search warrants procured by Defendant.

97.     The officers, agents, and others, including Defendant, who participated in and conducted the illegal seizures were government officials, acting under color of law.

98.     The seizures to which Mr. Adams was subjected were illegal or otherwise unjustified under the law and done without any probable cause or reasonable basis.

99.     Mr. Adams has suffered actual, tangible injuries as a result of the illegal seizures for which he is entitled to recover damages at trial.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Mr. Adams respectfully requests the Court enter judgment in his favor and award damages jointly and severally against Defendants in an amount to be determined by a **<u>jury</u>** at trial, including but not limited to:

a.   Compensatory Damages;

b.    Consequential Damages;

c.   Exemplary and punitive damages;

20

d.   Costs;

e.   Attorney fees; and

f.   Any other relief the Court deems just and proper.


By: */s/Vincent J. Ward*
Vincent J. Ward
Frank T. Davis Jr.
Freedman Boyd Hollander Goldberg Ward & Urias P.A.
P.O. Box 25326
Albuquerque, NM  87125
Phone: (505) 842-9960
Fax:    (505) 842-0761

*Attorneys for Plaintiff*

21